UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRENT YOUNG,

                Plaintiff,                              Hon. Hala Y. Jarbou

v.                                                Case No. 1:19-cv-854

WILLIAM JOURDEN, et al.,

                Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Trent Young has sued Defendants William Jourden, Bryan Clark, and Jessica Fusik pursuant to 42 U.S.C. § 1983, alleging that they violated his constitutional rights during an incident that occurred at the Kent County Correctional Facility (KCCF) while Plaintiff was housed there as a pretrial detainee on criminal charges pending in the Kent County Circuit Court. Plaintiff alleges that Defendants Jourden and Clark used excessive force on him and that Defendants Jourden and Fusik were deliberately indifferent to his serious medical need. The matter is before the Court on Defendants' Motions for Summary Judgment. (ECF Nos. 63 and 66.) Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the motion of Defendants Jourden and Clark be **GRANTED IN PART AND DENIED IN PART** and that Defendant Fusik's motion be **GRANTED**.[1]

---

[1] The Court denies the request for oral argument because the issues are adequately briefed, and oral argument would not further assist the Court in reaching a decision.

## I.   Background

In October 2018, Plaintiff was arrested for use of counterfeit bills and booked into KCCF. (ECF No. 67-2 at PageID.417.) KCCF is a circular building with inmate cells located on the outside walls along its circumference. (ECF No. 67-5 at PageID.469.) As of February 22, 2019, Plaintiff was housed in Pod "D3A," which denotes building D, floor 3 and the "A pod," or side of the floor. As depicted in the video that Defendants Jourden and Clark submitted as Exhibit H in support of their motion, a Control Center divides floor D3 down the center into two pods, Pod D3A and Pod D3B. (*Id.*; ECF No. 67-9.) The Control Center, or "Bubble," is surrounded by a hallway that has secure doors leading to the pods. The area between the secure door and the inmate cells is known as the dayroom—a communal space that inmates are permitted to use during specified times of the day. The dayroom contains a standing control deck, which allows officers to communicate with prisoners in their cells, open and close the cells, and control access through the secure door, which is located approximately fifteen feet from the secure door. (ECF No. 67-5 at PageID.469.) The dayroom also contains movable objects, such as chairs, trash cans and broom or mop sticks that could be used as weapons. (*Id.*)

Floor D3 is typically supervised by two deputies, one assigned to each pod, but both providing support to each other. (*Id.*) Floor D3 is medium level security, which is higher than most other parts of the jail and thus poses a higher security risk. (*Id*; ECF No. 67-6 at PageID.476.) Defendant Jourden routinely supervised Pod D3A during Plaintiff's stay at KCCF and, therefore, was familiar with Plaintiff. (ECF No. 67-5 at PageID.469.) Deputies at KCCF carry red canisters filled with oleoresin capsicum (OC spray)—a type of pepper spray providing a low-level force option for obtaining inmate compliance and control. (ECF No. 67-5 at PageID.471; ECF No. 67-7 at PageID.499; ECF No. 67-14 at PageID.531–32.)

On February 22, 2019, Defendant Jourden was supervising Pod D3A and Defendant Clark was supervising Pod D3B. At approximately 6:00 p.m., Defendant Fusik, a medical assistant, brought the med-cart to floor D3 to administer medications to inmates by a process known as "med-line" or "med pass." (*Id.* at PageID.470; ECF No. 72 at PageID.567.) Med-line occurs twice per day, once in the morning and once in the evening. (*Id.*) Defendant Jourden escorted Defendant Fusik into Pod D3A's dayroom, where she placed the med-cart near the standing control deck to administer medications. (ECF No. 67-5 at PageID.470.) Defendant Jourden stood at the control deck next to Defendant Fusik, calling out inmates and supervising the line to ensure that they received their medications in an orderly manner. (ECF No. 67-2 at PageID.432; ECF No. 67-5 at PageID.470.)

Defendant Jourden eventually paged Plaintiff to come out of his cell to receive his cortisone cream for his eczema. (ECF No. 67-2 at PageID.421; ECF 67-5 at PageID.470.) Plaintiff responded, "I'm cool," meaning that he did not want to come out of his cell for his medication. (ECF No 67-2 at PageID.427; ECF No. 78 at PageID.621.) Plaintiff explained that he was "very tired" and "just didn't feel like getting up period." *(*ECF No. 67-2 at PageID.430.) About 10 to 15 minutes later, Defendant Jourden told Plaintiff over the two-way speaker that he needed to come out of his cell to sign a medication refusal slip because he did not want to take his medication. (*Id.* at PageID.427; ECF No. 67-5 at PageID.470.) When Plaintiff approached the med-cart, Defendant Fusik told Plaintiff that he could sign a refusal slip or he could receive his cortisone cream.[2] (ECF No. 67-2 at PageID.429.) Defendant Fusik asked Plaintiff for his medicine cup that she had given him earlier that day during the morning med-line so that she could dispense the cream into the cup.

---

[2] Plaintiff was also supposed to receive ear drops, but Defendant Fusik told Plaintiff that she did not have them. (ECF No. 67-2 at PageID.429.)

Plaintiff said that he did not have his cup but would return to his cell to look for it and "jogged" away. (*Id.* at PageID.422.) When Plaintiff reached his cell, he discovered that the door was locked, so he stood by his cell waving his hand at the Control Center to let him in. As Plaintiff was looking toward the Control Center, he noticed Defendants Jourden and Fusik having a conversation at the med-cart, but he could not hear what they were saying. At that point, they began to walk toward the secure door to leave. (*Id.* at PageID.436, 438.)

Plaintiff approached Defendants Jourdan and Fusik and stated, "Why are you leaving? I did not get my medication." (*Id.* at PageID.437.) Defendant Fusik told Plaintiff that med-line was over, and Defendant Jourden said, "You are done. You just want to run around." (*Id.* at PageID.438.) Plaintiff followed Defendants as they exited the pod through the secure door. As the door began to automatically close behind them, Plaintiff put his foot in the door to stop it from closing and continued to ask Defendant Fusik for his medication, but she would not give it to him. (*Id.* at PageID.440.) Plaintiff eventually switched to using his hand to hold the door open. Plaintiff knew that the door would close by itself if he did not hold it open. (*Id.* at PageID.441.) By preventing the door from closing, Plaintiff was violating KCCF's rules set forth in the Inmate Handbook. (ECF No. 67-11 at PageID.511.)

Defendant Jourden, who had gone to the A-pod side, realized that Plaintiff was blocking the door from closing and was demanding his medication from Defendant Fusik, so he returned to the door. The video, Exhibit H to Defendants' motion, shows most of the events that followed. Defendant Jourden told Plaintiff not to step into the hallway. Plaintiff said that he was not in the hallway because he "had no business going in the hallway." (ECF No. 67-2 at PageID.440.) Plaintiff remained in the doorway using his arm to hold the door open and used his naturally loud voice to demand his medicine. (*Id.* at PageID.446, 448; Video at 18:25:03–18:26:52.) Defendant

4

Jourden again told Plaintiff, "You done . . . You done. You just want to run around and play." (ECF No. 67-2 at PageID.447.) After more than a minute and a half, Defendant Jourden attempted to close the door but Plaintiff stood in the way.[3] (ECF No. 67-5 at PageID.471.)

After repeatedly telling Plaintiff for close to two minutes that Plaintiff was "done," Defendant Jourden grabbed the door and pulled his bright red cannister of OC spray from his waistband and pointed it directly toward Plaintiff. (Video at 18:26:47.) Plaintiff knew that Defendant Jourden was pointing his OC spray at him, but he did not leave the area or return to his cell. (ECF No. 67-2 at PageID.449.) Instead, he stepped back "an inch." Defendant Jourden kept his OC spray trained on Plaintiff, but Plaintiff continued to argue about not getting his cortisone cream. (*Id.* at PageID.450, 452.) After about 15 seconds (18:27:03 on the video), Defendant Jourden deployed his OC spray. Plaintiff turned his head and apparently avoided the spray at first, but Defendant Jourden hit Plaintiff with a second spray when he turned his head back to face Defendant Jourden. Plaintiff then turned around and walked back into the dayroom. Although the OC spray hit Plaintiff, Defendant Jourden alleges some of it hit the doorframe and ricocheted into Defendant Jourden's eyes. (ECF No. 67-5 at PageID.472.)

Defendant Jourden retreated into the hallway and called for backup from other floors at the facility. (*Id.*) Defendant Clark, who had been alerted to the situation by the loud voices and had come to assist Defendant Jourden, followed Defendant Jourden into the dayroom. Because OC Spray had been used on Plaintiff, Defendants sought to secure Plaintiff by getting him to the ground. (*Id.* at PageID.472; ECF No. 67-6 at PageID.476.) The secure door closed behind them, locking them out of the Control Center. At that point, they could only reenter the hallway and

---

[3] At 18:26:38–39, the video shows Defendant Jourden grabbing the door with his right hand and moving it slightly. Although Defendant Jourden did not use much force, the video nonetheless confirms his statement that he attempted to close the door, but Plaintiff remained in the way.

Control Center if Defendant Jourden used his key to unlock the door by inserting it into the standing control deck. (ECF No. 67-5 at PageID.472.)

The video shows that, as Plaintiff walked around the dayroom rubbing his eyes, Defendant Jourden pointed his finger at the ground toward Plaintiff several times and twice pointed his OC spray at Plaintiff. Plaintiff alleges that Defendant Jourden sprayed him again with OC as he walked away into the dayroom. Although the video has no sound, Defendants appear to be yelling commands at Plaintiff. Within seconds, Defendant Jourden began to rub his eyes due to the OC spray. (*Id.*) At about the same time, Defendant Clark drew his taser and pointed it at Plaintiff. (ECF No. 67-6 at PageID.477.) Plaintiff failed to comply by continuing to walk around and wipe the spray off his face with his shirt or a towel. (ECF No. 67-2 at PageID.424, 457.) Defendant Clark therefore deployed his taser for five seconds, hitting Plaintiff with the probes in the left lower back and the right thigh. (ECF No. 67-6 at PageID.477.) As a result of the tase, Plaintiff fell to the ground and cut his chin. (ECF No. 67-2 at PageID.424.) Plaintiff was then handcuffed and other KCCF personnel arrived to provide medical care. Following the incident, Plaintiff pled guilty to the rule infraction of "failure to lock up." (ECF No. 67-16.)

## II.   Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III.   Discussion

#### A.      Excessive Force Claim

Plaintiff contends that Defendant Jourden's use of OC spray and Defendant Clark's use of a taser both constitute excessive force that violated his constitutional rights. Defendants contend that they are entitled to qualified immunity on this claim.

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second step. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "'[C]learly established law' may not be defined at such 'a high level of generality.'" *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "[A] plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Id.* (quoting *White*, 137 S. Ct. at 552). Stated differently, "[o]n both the facts and the law, specificity is [a court's] guiding light." *Novak v. City of Parma*, 932 F.3d 421, 426 (6th Cir. 2019).

In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court held that the use of excessive force on pretrial detainees is measured under the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which applies to convicted prisoners. Thus, the subjective prong of the Eighth Amendment deliberate indifference standard did not apply to the pretrial detainees in excessive force cases. Instead, the relevant inquiry is whether the force purposely or knowingly used against the prisoner was objectively unreasonable. *Id*. at 2473-74; *see also Coley v. Lucas Cty.*, 799 F.3d 530, 538 (6th Cir. 2015) (citing *Kingsley*). This inquiry is "highly fact-dependent" and "must take into account the 'perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.'" *Coley*, 799 F.3d at 538 (quoting *Kingsley*, 576 U.S. at 397). The inquiry must consider the

8

government's "legitimate interests" managing correctional facilities in pursuing "to preserve

internal order and discipline and to maintain institutional security." *Coley*, 799 F.3d at 538 (internal

quotations omitted). The *Kingsley* Court further provided:

> Considerations such as the following may bear on the reasonableness or
> unreasonableness of the force used: the relationship between the need for the use
> of force and the amount of force used; the extent of the plaintiff's injury; any effort
> made by the officer to temper or to limit the amount of force; the severity of the
> security problem at issue; the threat reasonably perceived by the officer; and
> whether the plaintiff was actively resisting. We do not consider this list to be
> exclusive. We mention these factors only to illustrate the types of objective
> circumstances potentially relevant to a determination of excessive force.

*Kingsley*, 576 U.S. at 397 (internal citations omitted). Both *Kingsley* and *Coley* stated that "pretrial

detainees cannot be subjected to 'the use of excessive force that amounts to punishment,' precisely

because they 'cannot be punished at all.'" *Coley*, 799 F.3d at 538 (quoting *Kingsley*, 576 U.S. at

400). *See also Young v. Kent Cty. Sheriff's Dep't*, No. 1:19-cv-854, 2019 WL 6872875, at *5–6

(W.D. Mich. Dec. 17, 2019).

In addition, "[t]he calculus of reasonableness must embody allowance for the fact that [jail]

officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

situation." *Graham*, 490 U.S. at 396–97. The analysis therefore includes a "built-in measure of

deference to the officer's on-the-spot judgment about the level of force necessary in light of the

circumstances of the particular case." *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015)

(internal quotation marks omitted). At bottom, a court's focus is not on the extent of the injury,

but "whether 'gratuitous violence' has been inflicted." *Coley*, 799 F.3d at 539 (quoting *Pigram ex*

*rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006)).

In a case such as this, involving multiple uses of force, the court must assess the

reasonableness of each use of force "in chronological 'segments.'" *Hanson v. Madison Cty.*

9

*Detention Ctr.*, 736 F. App'x 521, 529 (6th Cir. 2018) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996)). Further, "where, as here, there is 'videotape capturing the events in question,' the court must 'view[] the facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)).

### 1.      Defendant Jourden's Use of OC Spray

#### a.      The doorway

The first consideration in determining whether Defendant Jourden's use of OC spray on Plaintiff was objectively reasonable is the relationship between the need for force and the amount of force used.[4] Plaintiff's own testimony, as well as the video and other evidence, shows that Plaintiff created a confrontational situation for Defendant Jourden. Defendants Fusik and Jourden both informed Plaintiff while they were still in the dayroom that he had missed his opportunity for his medication, but he continued to push the issue by following them to the door. He then proceeded to violate clear KCCF rules that an inmate "will move as directed by a staff person," "will not hinder, oppose or interfere with any staff member," and "will not block or prop open a door" (ECF No. 67-11 at PageID.511), by admittedly holding the door open and failing to leave when Defendant Jourden told him that he was "done." It is undisputed that Plaintiff remained at the door arguing with Defendant Jourden for about two minutes. Defendant Jourden thus could have reasonably concluded that, in spite of his repeated commands that Plaintiff was "done,"

---

[4] Defendants rely extensively on the expert report of Emanuel Kapelsohn regarding the reasonableness of Defendants' actions. (ECF No. 67-14.) I have reviewed the report but have not relied on it in determining whether a genuine issue of material fact remains. *See Zuress v. City of Newark*, No. 2:17-cv-866, 2019 WL 4697026, at *7 (S.D. Ohio Sept. 26, 2019) ("An expert opinion offered on the objective reasonableness of an officer's use of force is a legal conclusion because 'objective reasonableness is the precise legal standard of *Graham* to be used in the qualified immunity inquiry . . . .'") (quoting *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 426 (6th Cir. 2006)).

Plaintiff was not going to back down absent *some* force.[5] Plaintiff insists that he was not being aggressive, but he fails to consider that Defendant Jourden could have reasonably interpreted his behavior (remaining in the doorway and continuing to argue in disregard of repeated directives) as aggressive or belligerent. Moreover, Plaintiff was not entitled to argue with Defendant Jourden until he relented simply because he was asserting his constitutional right to medical care. *See Hanson*, 736 F. App'x at 531 ("At some point, in response to defiance and belligerence, officers are entitled to 'preserve internal order and discipline.'" (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)); *Cameron v. Gurnoe*, No. 2:19-cv-71, 2019 WL 2281333, at *8 (W.D. Mich. May 29, 2019) ("The order and security of a prison facility would be severely hampered if prisoners could simply ignore any directive that interrupted their religious practices.").

Given the circumstances, Defendant Jourden's initial use of OC spray was proportional. Defendants argue that no violation occurred because the use of pepper spray causes no more than *de minimis* physical injury, but the Court need not employ that reasoning. It is well established that chemical spray is a constitutionally-permissible application of force when used to restore order or to gain an inmate's compliance. For example, in *Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004), the Sixth Circuit held that the defendant corrections officers did not violate the Eighth Amendment by using pepper spray on the plaintiff when he refused their repeated orders to leave the shower. *See White v. Fowler*, No. 88-2216, 1989 WL 88479, at *1 (6th Cir. Aug. 8, 1989) (affirming grant of summary judgment to corrections officer who used chemical spray on the

---

[5] Defendant Jourden claims that he ordered Plaintiff to "lockdown" at least four times. (ECF No. 67-5 at PageID.471; ECF No. 67-13 at PageID.517.) Plaintiff denies that Defendant Jourden told ordered him to "lockdown," but he concedes that Defendant Jourden repeatedly told Plaintiff that he was "done." For purposes of the instant motion, the Court must accept Plaintiff's version as true. But even under that version, Plaintiff should have understood that Defendant Jourden's directive that he was "done" clearly indicated that Plaintiff should stop arguing and return to his cell.

plaintiff in order to restore discipline and security on a prison bus). In *Roberson v. Torres*, 770 F.3d 398 (6th Cir. 2014), the court observed the Sixth Circuit has repeatedly held that "'the use of . . . chemical agents against recalcitrant prisoners'" does not violate the constitution. *Id.* at 406 (quoting *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992) (collecting cases)). Here, Plaintiff was a pretrial detainee and not a convicted prisoner, so the standards of the Fourteenth Amendment, rather than the Eighth Amendment apply. Nonetheless, *Kingsley* instructs that courts must bear in mind the "legitimate interests" of facilities such as KCCF in maintaining internal order and discipline. 576 U.S. at 397. Defendant Jourden's initial use of OC spray, given the circumstances he faced at the doorway, was consistent with these interests.

The use of OC spray was also reasonable in light of other factors set forth in *Kingsley*. First, there is no indication that Plaintiff suffered any physical injury or that he experienced any symptoms other than the routine burning and discomfort normally associated with the use of pepper spray. (ECF No. 67-18 at PageID.545.) Second, there is no indication that Defendant Jourden had other options. Physical force to remove Plaintiff could have resulted in physical injury to Plaintiff and/or Defendant Jourden, and no other deputies were in the immediate vicinity to assist with restraining Plaintiff. Finally, Defendant Jourden did not use the OC spray immediately, but instead gave Plaintiff fair warning that he intended to deploy it if Plaintiff persisted, by brandishing the cannister in plain view for almost fifteen seconds. Plaintiff knew that Defendant Jourden had drawn his OC spray (ECF No. 67-2 at PageID.449), yet he did not obey directives.

Plaintiff contends that Defendant Jourden could have handled the situation without deploying his OC spray by closing the door. (ECF No. 85 at PageID.670–71.) He has a point; the video shows that, as Defendant Jourden had opened the door and was holding the OC spray in his right hand, he could have closed the door on Plaintiff because Plaintiff was not touching the door.

But while hindsight is 20/20, it is useless in the moment, and the Supreme Court has directed district courts to view the circumstances "from the perspective of a reasonable officer on the scene," rather than through the lens of hindsight. *Graham*, 490 U.S. at 396–97. Defendant Jourden was facing an agitated and argumentative prisoner who had already violated policy by holding the door open and failed to heed commands that he was "done." He could have reasonably believed that some force was required to gain Plaintiff's compliance in returning to his cell. In sum, Deputy Jourden's use of OC spray while Plaintiff remained in the doorway—whether considered one or two uses—was objectively reasonable under the circumstances. *See Siggers v. Renner*, 37 F. App'x 138, 140 (6th Cir. 2002) (holding that the defendants' use of pepper spray was not excessive where force was necessary to obtain the plaintiff's compliance with the defendants' orders). Thus, Plaintiff fails to establish a constitutional violation.

### b.    The Dayroom

Plaintiff alleged in his complaint that Defendant Jourden employed his OC spray once after he initially pulled his OC spray out and then again as Plaintiff "walked off." (ECF No. 1 at PageID.8.) Defendant Jourden claims that he used his OC spray twice, both times in the doorway—the first time when Plaintiff turned his head and the second time when Plaintiff turned his head back and the gel spray rebounded off the door frame into Defendant Jourden's eyes. (ECF No. 67-5 at PageID.471.) Defendants deny that Defendant Jourden used his OC Spray on Plaintiff after he left the doorway. (ECF No. 67 at PageID.390 n.9.) Plaintiff, on the other hand, claims that Defendant Jourden sprayed him while he was walking around the dayroom out of view of the camera. (ECF No. 67-2 at PageID.454.)

The video seems to corroborate Plaintiff's claim that Defendant Jourden sprayed him a second time near the stairs when, at 18:27:22, Plaintiff wipes spray from the side of his face after Defendant Jourden again points his can of OC spray at Plaintiff. At this point, Plaintiff is seen

walking around as Defendant Jourden points to the ground. Accepting Plaintiff's version of events as true in light of the video, as I must on summary judgment, I conclude that a reasonable jury could find that Defendant Jourden's second use of OC spray was objectively unreasonable.

First, Defendant Jourden had already used OC spray on Plaintiff no more twenty seconds before the second use and had successfully defused the situation at the door. Second, as set forth more fully below with regard to Defendant Clark's use of a taser, Plaintiff's conduct—mere noncompliance with Defendants' orders to get on the ground—amounts to passive resistance under Sixth Circuit law. And the video indicates that the OC spray had already done its job by incapacitating Plaintiff to some degree, which could well explain Plaintiff's failure to immediately comply with Defendants' commands. Third, and again as set forth in more detail below, there is no indication on the video or in other evidence that Plaintiff was posing a threat to himself or others. At a minimum, a reasonable jury could conclude that Defendants did not face the "very serious security problem" they portray. (ECF No. 67 at PageID.402.) Finally, although Defendants stress that Defendant Jourden was already incapacitated from the OC spray that deflected into his eyes from the door frame, a reasonable jury viewing the video could choose to disbelieve Defendant Jourden's version, as Defendant Jourden is not seen rubbing his eyes until later in the video—after Plaintiff claims he used the OC spray for a second time in the dayroom.

Defendants argue that the circumstances that Defendant Jourden faced were similar to those the defendant faced in *Labadie v. Mitchell*, No. 2:14-cv-23, 2017 WL 279739 (W.D. Mich. Jan. 23, 2017), *aff'd*, 2018 WL 4488268 (6th Cir. May 11, 2018), in which the court concluded that the defendant acted reasonably in using chemical spray a second time on the plaintiff after the first spray appeared to have no effect. But *Labadie* is distinguishable for two reasons. First, it was decided following a bench trial and denial of the defendant's summary judgment motion. Second,

the circumstances in *Labadie* were much different. There, as the defendant was attempting to deal with an "out-of-control inmate" who had just flooded his cell with toilet water and was throwing things in his cell, the plaintiff began yelling at the unruly inmate so loudly that the defendant could not hear himself talk. The defendant first used chemical spray on the plaintiff after he refused to sit down, swore, and clenched his fists and raised his arms toward the defendant. *Id.* at *1–2. The defendant used chemical spray the second time after the plaintiff again refused orders to sit down, threw five gallons of liquid at the defendant, which soaked him, and then threw a mug of coffee at the defendant. *Id.* at *2. The circumstances in this case are not even close.

Having concluded that Plaintiff has presented sufficient evidence to establish a constitutional violation, at least where the facts are construed in his favor, the Court considers whether the law was clearly established. This is a closer question. It is clearly established that "[a]t the time of the incident, pretrial detainees had a clearly established right not to be gratuitously assaulted while fully restrained and subdued." *Coley*, 799 F.3d at 540 (citing *Pelfry v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995)). Here, of course, Plaintiff was not restrained. The Sixth Circuit has also observed, however, that:

> As a general rule, we have held that the use of pepper spray is excessive force when the detainee "surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002)). The logical corollary to this rule is that there is a very limited class of circumstances when the use of pepper spray is proper, including where a detainee is unsecured, acting violently, and posing a threat to himself or others. In *Monday v. Oullette*, 118 F.3d 1099 (6th Cir. 1997), for example, we found proper the use of pepper spray where the victim needed to be subdued to prevent a danger to himself. *Id.* at 1104–05. In *Gaddis v. Redford Twp.*, 364 F.3d 763, 774 (6th Cir. 2004), we found the use of pepper spray to be reasonable when officers feared that an arrestee, armed with a knife, was going to flee.

*Cabaniss v. City of Riverside*, 231 F. App'x 407, 413 (6th Cir. 2007). Although Plaintiff was not restrained by handcuffs, taking the facts most favorable to him, he had been subdued by the first use of OC spray and was neither being violent nor posing a threat to himself or others.

The Sixth Circuit's decision in *Guy v. Metropolitan Government of Nashville & Davidson County*, 687 F. App'x 471 (6th Cir. 2017), also informs the analysis. In that case, the plaintiff went to the officers' station in the pod to inquire about medical care after the defendant had ordered the inmates to return to their cells. After ignoring the plaintiff's request, the defendant went around the desk and approached the plaintiff. When the plaintiff did not voluntarily leave, the defendant placed a hand on her shoulder, turned her, and directed her forward as another officer appeared behind them. The plaintiff walked slowly, hesitated, and then proceeded again. As the plaintiff stopped once more and began to turn toward the defendant with her hands down, the defendant sprayed chemical spray in the plaintiff's face. *Id.* at 473. The court held that the defendant was not entitled to qualified immunity because both prongs of the qualified immunity analysis were satisfied. Regarding the clearly established prong, the court stated:

> [v]iewing the evidence in the light most favorable to plaintiff, we conclude that a reasonable officer would have been on notice in September 2013 that use of a chemical agent on a non-threatening pretrial detainee who did not comply with the officer's verbal orders and then passively resisted an open-handed escort by hesitating and stopping to turn to ask again about seeing a nurse would amount to constitutionally excessive force.

*Id.* at 476. While *Guy* is not directly on point, it is close enough to have put Defendant Jourden on notice that his conduct violated Plaintiff's Fourteenth Amendment right to be free from excessive force because Plaintiff was both passively resisting and non-threatening.

Accordingly, I recommend that the Court grant summary judgment to Defendant Jourden with regard to his use of OC spray in the doorway but deny summary judgment with regard to Defendant Jourden's alleged use of OC spray in the dayroom.

### 2.        Defendant Clark's Use of a Taser

Defendant Clark encountered Plaintiff under different circumstances. He arrived on the scene after Defendant Jourden had used the OC spray. Plaintiff had left the doorway and was walking around the dayroom wiping his face with his shirt or a towel. The video shows that, almost immediately, Defendant Clark draws his taser and points it at Plaintiff. Defendant Jourden orders Plaintiff to the ground but then begins to experience the effects of the OC spray in his eyes. Defendant Clark then walks toward Plaintiff, who is out of view, pointing the taser at Plaintiff. It is not clear whether Defendant Clark deployed his taser while he is seen on the video or after he walks out of view. In any event, Plaintiff claims that he was tased as he walked toward his cell and was never warned that would be tased. (ECF No. 67-2 at PageID.457.) Defendant Clark claims that he warned Plaintiff that he would tase him unless he got on the ground. (ECF No. 67-6.)

Defendant Clark argues that his use of the taser was objectively reasonable because Plaintiff was actively resisting by failing to comply with commands. (ECF No. 67 at PageID.406.) He contends that Plaintiff presented a security threat because he wiped the OC spray off of his face, continued to walk around, and ignored their commands. Defendants also note that, up to that point, Plaintiff had held the secure door open in disregard of the rules, failed to comply with Defendant Jourden's orders, and had avoided Defendant Jourden's use of OC spray at the doorway. They also point to other circumstances indicating that the use of a taser was reasonable: (1) Defendant Jourden was becoming increasingly incapacitated, which caused Defendant Clark to fear for the officers' safety; (2) backup had not yet arrived, and Defendant Clark could not let them in once they did arrive; and (3) no one was manning the other pod, leaving 89 inmates unattended. (*Id.* at PageID.406–07.)

I begin with the issue of active resistance. The Sixth Circuit has observed that "[a]ctive resistance to an officer's command can legitimize an officer's use of a Taser," *Goodwin v. City of*

17

*Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) (citing *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012)), and that "[s]uch resistance can take the form of 'verbal hostility' or 'a deliberate act of defiance.'" *Id.* (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534–35 (6th Cir. 2013)). Active resistance generally arises "where the suspect causes the officers to be exposed to volatility, hostility, and danger in a way that increases with the passage of time, thus justifying (and often requiring) the use of force." *Eldridge*, 533 F. App'x at 535 (citing *Lawrence v. Bloomfield Twp.*, 313 F. App'x 743 (6th Cir. 2008)); *see also Jackson v. Washtenaw Cty.*, 678 F. App'x 302, 306 (6th Cir. 2017) (active resistance "can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders"). However, the Sixth Circuit distinguishes active resistance from passive resistance, *id.*, holding that "mere noncompliance is not active resistance," *Woodcock v. City of Bowling Green*, 679 F. App'x 419, 423 (6th Cir. 2017) (citing *Goodwin*, 781 F.3d at 323-24); *see also Rudlaff v. Gillispie,* 791 F.3d 638, 642 (6th Cir. 2015) ("A simple dichotomy thus emerges: When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.").

The Sixth Circuit has considered what constitutes active resistance in a variety of circumstances involving use of a taser. For example, in *Caie v. West Bloomfield Township*, 485 F. App'x 92 (6th Cir. 2012), the court held that the officer's single use of a taser was not unlawful where the plaintiff was intoxicated and suicidal, had mused about fighting the officers to get them to shoot him, ran and violently flailed his arms when the officers tried to detain him, and refused to comply with their order to move his hands from under his body so that he could be handcuffed. *Id.* at 96–97. In *Eldridge*, *supra*, the court found that the plaintiff, who was a diabetic and suffering from a hypoglycemic episode, was not actively resisting when he responded, "I'm fine," to the

18

officers' commands to exit his vehicle before they tased him. The court found that the plaintiff's "noncompliance was not paired with any signs of verbal hostility or physical resistance, and therefore cannot be deemed active resistance." 533 F. App'x at 535. Similarly, in *Goodwin*, *supra*, officers responding to a noise complaint asked the plaintiff to step outside his home. When the plaintiff refused to do so, closed the door, and walked away, the officers kicked the door in and tased him. The court found that neither the plaintiff's single statement that he would not leave his apartment nor the fact that he remained inside constituted active resistance justifying the use of a taser. 781 F.3d at 323–24. Finally, in *Kent v. Oakland County*, 810 F.3d 384 (6th Cir. 2016), the court concluded that the plaintiff's noncompliance with the officers' orders to calm down did not constitute active resistance, even though the plaintiff yelled at the officers, including, "Go ahead and taze me, then," because his conduct did not present a physical threat, he never attempted to flee, and he never attempted to prevent officers from handcuffing him, as had happened in other cases in which active resistance had been found. *Id.* at 393–94.

Although Defendants contend that Plaintiff's failure to comply with their verbal commands to get on the ground amounts to active resistance, his actions during the relevant time are closer to passive resistance, for example, the plaintiff's refusal to exit his vehicle in *Eldridge* after being ordered to do so. *See Dickey v. Knoxville Police Dep't*, No. 3:17-cv-412, 2019 WL 3949049, at *6 (E.D. Tenn. Aug. 21, 2019) (finding a genuine issue of material fact as to whether the plaintiff's refusal to comply with the officer's commands to move in front of the police cruiser or get on the ground constituted active resistance where the plaintiff was not aggressive or threatening to the officer). First, there is no evidence that Plaintiff had physically or verbally threatened Defendant Jourden during the incident in the doorway, nor is there any evidence that he did so after Defendants followed him into the dayroom. Second, there is no indication that Plaintiff was

attempting to flee or avoid Defendants. Instead, he testified that he was walking toward his cell (incidentally, as Defendant Jourden had ordered), when, without warning, he was tased in the back. He had just been sprayed twice with OC spray, so it is not surprising that he was not immediately responsive to commands.

Regarding the relationship between the need for force and the amount of force used, and the severity of the security problem at issue, the video shows that the situation was not as threatening, chaotic, or urgent as Defendants portray. Defendants argue that Plaintiff posed a serious threat, but that is not apparent from the video, which shows Plaintiff doing no more than walking around wiping spray off his face. And, while it is true that in the preceding minutes Plaintiff had violated facility rules by holding the door open and persisted in arguing with Defendant Jourden, the two applications of OC spray were largely effective in repelling and subduing Plaintiff. Defendants also suggest that Defendant Clark found himself outmanned because Defendant Jourden was "out of it" due to the OC spray in his eyes and two other inmates were roaming the pod. However, a jury may conclude from the video that Defendant Jourden was not so "out of it" that Defendant Clark was effectively left to fend for himself in securing Plaintiff. As for the other two inmates, they kept their distance, looking on with interest at times, but for the most part going about their business cleaning the dayroom. Finally, as to the 89 inmates that Defendant Clark left in the other pod, Defendants provide no particulars. For example, were all 89 inmates out of their cells roaming around? Was there a situation that necessitated an elevated level of force to control quickly the situation so that Defendant Clark could attend to that issue? The video does not suggest that was the case: once backup personnel arrived, Defendant Clark is not seen hurrying back to his side.

The fact that Plaintiff suffered minimal injury—a cut to his chin not requiring stitches—might indicate that the force was not excessive, but the Sixth Circuit has instructed that the inquiry "focuses on the force itself rather than the injury." *Coley*, 799 F.3d at 539. As Defendants point out, however, Deputy Clark deployed his taser in accordance with his training and only for five seconds, the default time for a taser application, which provided the maximum incapacitation while reducing the risk of serious injury to Plaintiff. (ECF No. 67 at PageID.408.) This fact indicates an objectively reasonable use of force. *See Goodwin*, 781 F.3d at 324–25 (concluding that an unreasonably long 21-second taser application indicated a severe application of force).

Balancing the above considerations, I conclude that a jury could reasonably find that under the circumstances, Defendant Clark's use of a taser on Plaintiff violated Plaintiff's right to be free from excessive force under the Due Process Clause. In particular, the evidence viewed in a light most favorable to Plaintiff shows that: (1) Plaintiff was not actively resisting; (2) he did not threaten the safety of Defendants or other inmates; (3) Defendant Clark did not warn Plaintiff that he would be tased; and (4) the facility's interests in institutional security and management did not justify the use of a taser.

The question remains whether the law was clearly established as of the time of the violation. "The key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional." *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009). As noted above, a court should not define the right at a high level of generality, but "a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts" is not required. *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Here, the constitutional question can reasonably be framed as whether a pretrial detainee who was neither actively resisting

nor posing an apparent threat to facility staff or other inmates and who was disoriented from two prior chemical spray deployments has a right not to be tased.

"There is no clearly established right for a suspect who 'actively resists' and refuses to be handcuffed to be free from a Taser application." *Goodwin*, 781 F.3d at 325 (citing *Hagans*, 695 F.3d at 509). On the other hand, the Sixth Circuit has drawn a clear line: "When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Rudlaff,* 791 F.3d at 642. The court has also made clear that "[a]bsent some compelling justification—such as the potential escape of a dangerous criminal or the threat of immediate harm," an officer cannot tase a "non-resistant" person. *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498 (6th Cir. 2012) (quoting *Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. 2010)). Because, as discussed above, Plaintiff's conduct is more akin to passive resistance under Sixth Circuit precedent, Defendant Clark should have been aware that his use of a taser on a non-resistant inmate was unlawful.

## B. Deliberate Indifference

Plaintiff contends that Defendants Jourden and Fusik violated the Fourteenth Amendment because they were deliberately indifferent to Plaintiff's serious medical need when they denied him his cortisone cream for his eczema during the evening med-line.[6] This claim is governed by

---

[6] In his declaration, Plaintiff also alleges that Defendant Fusik did not treat his wounds after he was tased and fell to the floor. (ECF No. 78 at PageID.623.) In his complaint, Plaintiff alleged that "the Nurse came [and] wipe[d] my face then I was walked to Seg. Put in a cell with an open wound left bleeding with no bandages, or anticbitic [sic] or pain pills." (ECF No. 1 at PageID.9.) Plaintiff does not identify the nurse who failed to treat his cut or wound in his complaint. In his deposition, however, he testified, "I could not see who attended to me because I got maced twice." (ECF No. 67-2 at PageID.458.) He further said that "[s]omeone" attended to him but admitted that "I don't know who." (*Id.*) Given Plaintiff's admissions in his deposition, he may not contradict them with a subsequent declaration. As the Sixth Circuit has observed, "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts h[is] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.

the Eighth Amendment's two-pronged deliberate indifference standard. *See Richmond v. Huq*, 885 F.3d 928, 937–38 &938 n.3 (6th Cir. 2018) (declining to apply *Kingsley* and adhering to the Eighth Amendment deliberate standard for Fourteenth Amendment denial of medical care claim).

The unnecessary and wanton infliction of pain encompasses "deliberate indifference" to an inmate's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976); *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001). Determining whether denial of medical care amounts to an Eighth Amendment violation involves two steps. First, the court must determine, objectively, whether the alleged deprivation was sufficiently serious. A "serious medical need" sufficient to implicate the Eighth Amendment is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). Thus, the objective component is satisfied where a prisoner receives no treatment for a serious medical need. *See Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 898 (6th Cir. 2004), the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier*, 238 F.3d at 742 (internal quotation marks omitted).

If the plaintiff satisfies the objective component, he must then demonstrate that the defendant possessed a sufficiently culpable state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be

---

1986). Based on Plaintiff's admission this claim should also be dismissed.

> aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, the plaintiff "must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. at 829, 847). To satisfy this part of the analysis, the plaintiff must demonstrate that the defendant acted with "deliberateness tantamount to intent to punish." *Miller v. Calhoun Cty.*, 408 F.3d 803, 813 (6th Cir. 2005).

### 1.    Pertinent Facts

Plaintiff's eczema was diagnosed after he arrived at KCCF. On October 5, 2018, one day after Plaintiff arrived, Heather Turnell, R.N., indicated in a medical screening form that Plaintiff's skin appeared normal. (ECF No. 65 at PageID.365.) On December 4, 2018, Plaintiff was prescribed cortisone cream for his eczema, with a start date of December 5, 2018 and an end date of December 19, 2018. (*Id.* at PageID.367.) On February 14, 2019, Joanne Sherwood, N.P., ordered cortisone cream to treat Plaintiff's eczema, which Plaintiff was to apply twice per day for 30 days. (*Id.* at PageID.368.) On February 21, 2019, N.P. Sherwood prescribed Plaintiff cortisone cream, with a start date of February 22, 2019 and an end date of March 24, 2019. Plaintiff was to apply the prescription twice per day for 30 days. (*Id.* at PageID.369; ECF No. 63-3 at PageID.354.)

On the morning of February 22, 2019, Plaintiff's skin was "just cracked and dry." (*Id.* at PageID.359.) On the evening of February 22, 2019, Plaintiff's skin was dry, and he had scratched it until it bled, even though medical staff told him not to scratch his skin. (*Id.* at PageID.357.) Plaintiff testified that he would have been fine without his medication until the 7:00 a.m. med-line the following morning if he had slept through the night because he would not have noticed the itching. (*Id.* at PageID.355.) Plaintiff also testified that there were times when he missed med-line,

mostly in the morning but sometimes at night. (*Id.* at PageID.359.) On March 1, 2019, Angela Navarro, R.N., examined Plaintiff and noted that his skin was warm and dry, but redness and scratching were not indicated. (ECF No. 65 at PageID.370–71.)

### 2.    Serious Medical Condition

On initial review of Plaintiff's deliberate indifference claim, the Court noted that "[d]ry skin experienced by the general population is typically not a sufficiently serious medical condition to state a deliberate indifference claim," but allowed the claim to proceed based on *McKeithan v. Beard*, 322 F. App'x 194 (3d Cir. 2009), which observed that a plaintiff might succeed on a skin condition medical claim were the inmate's skin "is 'so cracked and dry from his condition that it bled.'" *Young*, 2019 WL 6872875, at *7.

In general, courts have held that skin conditions, including eczema and rashes, which produce only dry and cracked skin, do not amount to a serious medical condition. *See Sledge v. Kooi*, 564 F.3d 105, 107–08 (2d Cir. 2009) (per curiam) (holding that the plaintiff failed to show that any one of his conditions, including eczema, was a serious medical need); *Ahlers v. Kaskiw*, No. 9:12-cv-501, 2014 WL 4184752, at *10 (N.D.N.Y. Aug. 21, 2014) ("No rational fact finder could conclude, on the record in this case, that plaintiff's complaints about treatment of his skin rash and eczema at CNYPC met either the objective or subjective prongs of the deliberate indifference test."); *Johnson v. Sullivan*, CV–07–00574–ROS, 2010 WL 2850787, at *2 (E.D. Cal. July 19, 2010) (skin condition did not qualify as serious medical need when there was no suggestion skin condition affected inmate's activities or caused him substantial pain); *Witherspoon v. Africa*, JFM–10–1832, 2010 WL 4183508, at *2 (D. Md. Oct. 25, 2010) (dry skin and rashes do not comprise serious medical problems).

Defendant Fusik contends that the instant case is similar to *Owusu v. Michigan Department of Corrections Pain Management Committee*, No. 16-cv-12490, 2019 WL 6139486, *report and*

*recommendation adopted*, 2019 WL 4627585 (E.D. Mich. July 19, 2019), in which the court held that the plaintiff's rash or dermatitis was not sufficiently serious to support an Eighth Amendment claim. The plaintiff in *Owusu* alleged that he began itching in November 2012 and that he called healthcare in December 2012 after he ran out of hydrocortisone cream and experienced severe itching. The plaintiff told the defendant that he had been "scratching himself bloody," and he attributed the itching to an allergic reaction. The defendant then examined the plaintiff and denied his request for hydrocortisone cream for itching, but left a note instructing healthcare to call the plaintiff out the next morning and give him a tube of hydrocortisone cream. The plaintiff received the crem the following morning, which provided him some relief. The court found that the defendant's "failure to provide Plaintiff with hydrocortisone cream until the following day does not implicate the Eighth Amendment's prohibition against cruel and unusual punishment." *Id.* at *13.

Here, as in *Owusu*, Plaintiff cannot demonstrate an Eighth Amendment claim because his condition was not objectively serious. Plaintiff's skin, which was cracked and dry, bled only because Plaintiff scratched it, contrary to healthcare's instructions. Plaintiff presents no evidence that his eczema affected his activities or caused him pain. Moreover, Plaintiff's own conduct and testimony demonstrates that his condition was not severe. He initially decided to forego his treatment that evening and only changed his mind when called out to sign the refusal of treatment form. Plaintiff also confirmed that he would have been fine until the next morning if he could sleep through the night. Nothing in the record indicates that Plaintiff's eczema was a serious condition. Thus, Plaintiff's deliberate indifference claim fails on the objective prong.

### 3.    Subjective Prong

Even if Plaintiff's eczema constituted a serious medical condition, Plaintiff fails to present any evidence that either Defendant Jourden or Defendant Fusik were aware that Plaintiff would be

26

subjected to a substantial risk of harm if he missed a single application of cortisone cream. Defendants could have reasonably inferred from Plaintiff's initial refusal of treatment on February 22 that he was not at a risk of harm if he did not receive his cortisone cream application until the following morning. Moreover, Plaintiff testified that he sometimes missed med-line himself, further suggesting that Defendants did not disregard a substantial risk to Plaintiff of which they were aware. *See Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

Accordingly, I recommend that the Court grant summary judgment on this claim.

## IV.   Conclusion

For the reasons set forth above, I recommend that the Court **grant in part and deny in part** Defendant Jourden and Clark's motion for summary judgment (ECF No. 66) as follows: (1) dismiss the excessive force claim against Defendant Jourden with regard to his use of OC spray in the doorway but allow it to proceed as to whether he used OC spray in the dayroom and whether any such use was unconstitutionally excessive force; (2) allow the excessive force claim against Defendant Clark to proceed; and (3) dismiss the deliberate indifference claim against Defendant Jourden. I further recommend that the Court **grant** Defendant Fusik's motion for summary judgment (ECF No. 63) and dismiss her from the case.

Dated: February 5, 2021                                              /s/ Sally J. Berens
                                                                        SALLY J. BERENS
                                                                        U.S. Magistrate Judge

## NOTICE TO PARTIES

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file

objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).